237168 You can relax.   It's going to be a minute. It's going to be a moment for everybody to... They'll all be disappointed later when they realize they missed the real action. Yours is still an important case. It may not attract the same crowd, but it's very important. I guess the question is, is it a disappointment or a relief that the project is leaving? I guess it depends on your view of oral argument. Okay. Mr. Brindley? Yes, Your Honor. May it please the Court. My name is Bo Brindley, and I represent the defendant appellate, Julia Greenberg. Ms. Greenberg appeals on a number of issues, but the first that I would like to discuss today is the issue of the willful blindness instruction that was given by the district court in this case. The requirements for willful blindness are really two things. A substantial likelihood that the defendant is aware of a criminal activity, and then a deliberate act of avoidance. And in this case, there was no deliberate act of avoidance. Ms. Greenberg questioned these cooperating sources both extensively. So there was no failure to take any action or deliberate act to do something not to find out. So what it comes down to from the government is this argument about psychological avoidance, essentially being sufficient to justify willful blindness. And as we noted in our brief, the Seventh Circuit has repudiated psychological avoidance for willful blindness in the Macias case, and for good reason, we believe. This case provides an excellent vehicle to see the dangers of psychological avoidance giving rise to willful blindness, because this is a lawyer, a defense lawyer, and defense lawyers, every time we interact with a client, we have a substantial reason to believe that probably may not be telling us the whole truth. She's not acting as a criminal defense lawyer in this context, is she? Well, she's acting as a defense lawyer for someone seeking asylum. It's not criminal defense, but it is defense nonetheless. Well, all client representation at some level is advocacy. I'm just surprised to hear you equate it to criminal defense. I think it comes very – in this context, I think it comes very close, given that there's – what they want her to do here is evaluate whether these people are truth-tellers and violating the law. And so I think there is a similarity there. But regardless of the fact, the problem here is we have a lawyer who has duties to the client and duties of confidentiality, and that lawyer – we're being told that psychological avoidance, according to the government, is enough. If the lawyer doesn't do enough to find out that the client isn't being completely forthcoming, that that justifies willful blindness. Wasn't there a difference between completely forthcoming and her having specific concerns? You know, as to the CS – and I apologize, I can't recall if it's one or three – that sought guidance, sought asylum based on – Homosexuality. Homosexuality, that, you know, I thought he wasn't gay. Well, I thought he might be gay. And if that's the basis of the petition, doesn't she have an obligation to sort that out before she advances the petition? Well, I – well, I think she – does she have an obligation to sort that out? To be – as a, you know, part of her duty of candor to the court, but doesn't she have to ask the question point blank, is this true or false, this statement that we're making in this petition? No. I don't think any lawyer is required to ask that question point blank. I think it's circumstance defined. In this instance, the person was providing details, suggesting that it was true, and she did ask them repeated questions to determine it. And the individual kept providing more and more details to suggest that he was indeed gay. And, you know, as we talk about in other parts of our brief, the idea that somehow Ms. Greenberg's predilection or her stereotypical view of what being gay might mean should have been decisive such that she should have withdrawn from the case or taken some other action, I think that's outrageous. I mean, I'm not sure that's the basis here. I'm thinking about – she's preparing them, right, and they have a conversation about what date would be better to say this assault happened. Would it be better to say it happened in the winter or the spring? And she says, well, given that the Soviet law was in effect during this time, but not during that time, it would be better to say this event, which presumably if it really had happened in real time, it would have happened on a date certain, not a date that they decided based on her coaching. Now, maybe that's direct knowledge rather than conscious avoidance, but in that context where there's uncertainty as to when a meeting occurred, it seems to me, rather than telling him when the meeting they should say was, that would be a time to say, well, when did it happen, right? That's the question if he's saying when would it be better for me to say. The answer would be when did it happen. Well, I think it's hard to dictate exactly what you say in those circumstances to a client. I mean, if the client is asking you a question, would it be better here or there, in reality you may have a duty to answer the client's question and give them an accurate answer and then let them decide what they're going to tell you. We are at the mercy of what the clients tell us. And so if they're asking a question, I think we need to answer their questions fairly, and then we need to let them make a decision about what they're going to say. They can choose to tell us the truth. They can choose to lie. But in that regard, willful blindness plays no role. Lawyers dealing with clients aren't psychologically, he wasn't psychologically avoiding anything. She was responding to what he said, and then he made a determination to say this is when it happened, and that's what she was left with. She doesn't know when it would happen. She doesn't have that knowledge. He does. Nor did she know whether he was gay or not. The cooperating source who was claiming homosexuality, she didn't know. He told her that he was, and she questioned him about it. But nothing in all of this questioning and nothing in all of the interactions showed a deliberate act of avoidance. And because we get this psychological avoidance coming up in this strange context of a lawyer who has to do these interactions with a client to help the client, and the client is the one that has the information and ultimately has to supply it, I think it creates a very difficult situation in which the jury is likely to have convicted because they thought she should have done more to investigate rather than believing what is required. And that's the risk with Wilf O'Brien, and that's what they were worried about in the Macias case. Macias was about a guy who claimed that he thought the money he was bringing across the border was for one crime rather than drug trafficking, I think sex trafficking or something. And the Seventh Circuit said he didn't have to investigate anymore. They believed that's what he was. And what they're really doing here is they're asking Ms. Greenberg to do more investigation. That's the only thing she could have done, I guess, and I'm not sure what it would have been, to be sufficient. So under the circumstances, I think Wilf O'Brien, this could very well have created a finding of guilt that's not based on knowledge in this case. And so I see my time is up, Your Honor, so if there aren't other questions. We'll hear from you again in the afternoon.  Mr. Brandon. Good morning. I'm Jim Brandon. I represent Mr. Danskoi on the appeal. I represented Ms. Greenberg at the trial level. Principally, I've argued that the evidence of guilt is insufficient, and then I've argued the very same point that Ms. Greenberg has argued, that the conscious avoidance charge was given in error. With regard to sufficiency, the government had to prove that the defendant had a joint purpose to submit materially false statements in pursuit of Olenek's asylum application. He met Mr. Olenek five times. On the first time, Mr. Olenek said that he was 52 years old, he was unmarried, he had no children. There was some discussion about getting status by perhaps getting married. Mr. Danskoi hinted that that could be to a woman, that could be to a man. He was okay with either of those selections, but he would not help find a mate for Mr. Olenek. Mr. Olenek said that he would pollute political prosecution for his asylum basis. On the second meeting, not much happened. Again, the defendant impressed upon Mr. Olenek that he had to write his own statement. Russian America was not going to write the statement for them, or for him, I'm sorry. In between the second and the third meeting, the FBI handlers decided that Mr. Olenek should proceed as a gay man. Mr. Olenek came to the third meeting and said that he was going to petition as gay. The defendant said he was great with that, he likes his gay clients, it's a good basis for seeking asylum. In the middle of this meeting, Olenek does say, however, you know, I'm not gay, or something to that effect. But as Mr. Danskoi testified at the trial, he was awkward, nervous, had strange affectations when he mentioned this. They have five meetings. Why isn't this good argument? I mean, I think you're describing an innocent way to interpret the fact that Danskoi says, I don't hear it, when he says I'm not gay. I don't hear that. And you come up with a plausible, innocent explanation, and the jury can consider that. I guess I'm wondering whether we can say that your plausible interpretation of that is so definitively the only interpretation that we would overwrite a jury's verdict. It gets to the point where the jury was permitted, based on these facts, to find that the defendant was probably guilty. You know, there was one little line in the entire 1,500 pages of this trial where Olenek says that he's gay. And then there are all these meetings where, otherwise, he says that he is gay. And he's working with E. Caterina, the specialist in Italy, who's writing up his petition for him. Mr. Danskoi is not part of writing up the petition. He eventually does read the petition. And he says, I'm completely convinced by this because it was so concise. E. Caterina would never have written a petition in this style. It had to be his own words. I thought he was gay. I thought he was gay the first time I met him. I thought he was gay at the end. That's the problem with this sufficiency. And then, again, as prior counsel has argued, it was error to give the conscious avoidance charge. Mr. Danskoi, as I've already noted in my last few minutes, discussed Olenek's gayness repeatedly, at least at the last three meetings, and was telling him he should get in touch with his feelings, be more expansive. If E. Caterina says you need to be more expansive to be successful, write some more. It's okay. We're all behind you, that sort of stuff. So at no point did he ever suggest, you know what? I don't want to hear about this anymore. He was just the opposite. He was very forthcoming and requesting as much information as Olenek wanted to provide. Okay, thank you. Attorney Felton. Good morning, Your Honors, and may it please the Court. My name is David Felton. I'm an assistant United States attorney in the Southern District of New York. I represent the United States on this appeal, and I did represent the United States in the proceedings below. Because the evidence was more than sufficient to sustain the convictions, and there was no instructional error, the judgments of conviction should be affirmed. First, I'll address the sufficiency of the evidence point first, and then I'll briefly address conscious avoidance unless there are further questions from the Court. As the Court knows, it's an extremely deferential standard where the Court defers to the jury's credibility assessments. The same argument Mr. Brandon raised about the lack of criminal intent that Danskoi had was what Danskoi testified to understand, what counsel argued throughout trial, and the jury rejected. On sufficiency of the evidence review, that evidence is more than sufficient to sustain his conviction. On the conscious avoidance point. Actually, before you get to the conscious avoidance, on the sufficiency, you know, there were three different objects of the conspiracy, and there's a challenge. I think in Mr. Danskoi's case, it's sort of more generic, but as in Attorney Greensburg's case, it's a more specific challenge to each of those. And you've represented or argued that we only need to find the evidence sufficient as to one of the three theories, and it's based on the Griffin discussion, Griffin about that fact. And I'm just struggling a little bit, and I wanted to get your reaction. Griffin makes it clear that challenges that are challenges to the legal sufficiency of evidence rather than the evidentiary sufficiency follow the Yates framework, where we have to evaluate them if the jury might have followed them, whereas challenges to the evidentiary sufficiency, the rule that you stated applied. And I'm wondering whether it's really fair to characterize her second argument having to do with the first paragraph of 1546A as a sufficiency of the evidence rather than a legal sufficiency. Yes, Your Honor. So what I would direct the Court to first, I think our primary argument on this front, is transfer pages 1188 to 1192, where the government requested a special verdict form where the jury would return a verdict as to all three of the objects. And as we explained to Judge Etkin, this way if there's a legal issue ever raised about any of the objects down the road, we will know which objects the jury convicted the defendant of. The defendants objected. They said, we want a general verdict form, and there's good reason for that. You know, we'd have to just check not guilty once as opposed to three times. And over the government's objection, the Court said, you know what, I'm going to give a general verdict. And the defendants specifically argued in seeking over the government's objection the general verdict form that, look, we don't think that's likely to arise here where there's a challenge as to any of the other objects. But it has, right? And we have a legal framework for figuring out whether we have to address them all. I mean, I thank you for that history. That's helpful. But help me understand why Yates doesn't apply to the challenge to the second object of the conspiracy. Yes, Your Honor. And so there, the defendants did not propose an alternative jury charge on the counterfeiting point with respect to Paragraph 1. So it's plain error? We submit it's plain error, Your Honor. Okay. But we would still have to review it. Yes, Your Honor. And we believe Judge Nathan's well-reasoned opinion consistent with the first, third, and ninth.  I literally was only wanting to understand this assertion that if we find evidence sufficient as to the object of the conspiracy under 371, we're done on the sufficiency. And I think what I'm hearing you say now is maybe you're not going so far as conceding, but saying if we feel the need to, if we think that there's a legal challenge as to the second one under Yates, then we should just follow Judge Nathan's reasoning. Yes, Your Honor. I'm saying to the extent the court gets to those objects, it would be plain error. But I'm saying the defendants actually truly waived this argument by seeking the general verdict. Okay. So seeking a general verdict is a waiver of the Yates argument. A true waiver. Is there a case that says that? No, Your Honor. But it's a knowing and intentional and voluntary right. Okay. But we don't have a citation for that. It was raised for the first time in the defendant's reply brief. All right. I interrupted you when you were going to talk about conscious avoidance. Sorry about that. Go ahead. No, I'm sorry, Your Honor. On conscious avoidance, we think this Court's decisions in Wedd, in Espino, and Judge Robinson, as you'll recall from the Kumar case just a few weeks ago, when the circumstances are so overwhelmingly suspicious, the defendant's failure to question them satisfies conscious avoidance. Wedd is a precedential opinion, Espino and Kumar are similar circumstances here. And, in fact, Judge Etkin below at 1202 and 1203 of the transcript said, I don't think I've ever had a criminal trial where the parties didn't dispute the applicability of conscious avoidance, and I think this is probably a better case for conscious avoidance than I've ever had. And I think that's because of how circumspect Greenberg was in not asking the ultimate question, in not doing any meaningful diligence to investigate the client's claims, as well as knowingly coaching and preparing the clients to give knowingly false information, as we know from her confession, to USCIS in order to obtain asylum under fraudulent pretenses. So can you talk a little bit about, I mean, it is sort of a different animal when we're dealing with an attorney, and the conscious avoidance relates to how intensively they interrogated their client about the truthfulness of the client's story. And you can see why you might run into a concern if you went too far on that front, that you're suddenly turning attorneys into policing their clients rather than trying to figure out, given what their clients are telling them, how to best present their case without knowingly misrepresenting anything to the court. You're an attorney, your client comes in not for the government but for a private party. You kind of suspect your client's story seems fishy. Do you have an obligation to look your client in the eye and say, I need to know whether that's true? Your Honor, under the facts in our case, I think this is a clear case where you're not allowed to support perjury and knowingly coach a client to provide knowingly false information, such as- The difference between the attorney-client privilege as it might arise when you're defending a case, the facts of which have already occurred, and it's a normal criminal prosecution, and you're trying to figure out what went on. But you may choose to or you may not choose to talk to your client because you don't want to be supporting perjury. And so sometimes defense lawyers will just simply say what happened and the client will tell them a story. And that's the end of it. An attorney is doing that as part of the job of a defense lawyer with the facts already out there, whatever they may be. That's different from the possibility of a future crime that the lawyer may be participating in and might have to take a different approach. Yes, Your Honor. And that's what we have here. We have a client who's engaged in an activity that may be problematic. And what's the lawyer's role in that when the lawyer is being asked to really support the client in conduct that is forthcoming? Yes, Your Honor. And what I would say here is where the client says, I did not write this blog. I don't know what it says. And the defendant is coaching the client to answer. And here's the client answer. Yes, I did author this blog. That is crossing all ethical lines.  So that gets you knowing, right? I think that evidence is sufficient to show knowing. What I think the mischief is, as I understand the argument, is, look, if you can prove that a lawyer knows, that's fine. But if we start telling juries that conscious avoidance in the form of psychological avoidance, I suspect they're lying. But I'm not going to probe further. If we start criminalizing that on the part of the lawyers, that puts a lot of lawyers in a bind in cases just like the one my colleague just described, where, yeah, not only is the client lying about what happened in the past, but by promoting that lie to the court, it's going to be engaging in perjury. It's a future crime. Yes, Your Honor. I mean, there's no conscious avoidance exception for attorneys in the case law that we're aware of. And we think here, you know, there's no sort of higher burden to merit a conscious avoidance charge of an attorney, especially here where the defendant, you know, when she hears this information, I didn't prepare the blog, the reaction isn't, well, who did? Can I call the person who did? Rather than interrogating her client, she could have called Yuri Moshe to figure out what happened. Instead, she says, go to the bathroom and memorize it, and then sits there and prepares him to say, I did write the blog. That crosses all possible lines. And we think here where there are other indicia where the defendant says, I had to change the story three, four, five times. Moshe added this in where I was assaulted in 2016. Again, the story, what I'm trying to figure out is that what you just described is, again, another example of clear evidence of knowing conduct. And what I think the issue they're raising is substituting for knowing this standard of conscious avoidance. And I guess I'm just, is there, can you give me an example of something that happened with defendant Greenberg and either of the clients that wouldn't really constitute knowledge of, evidence of her knowledge of a lie, but reflects conscious avoidance of knowing? Yes. Her not, I guess when, for instance, CS3 tells Danskoi, I'm not gay. Whereas the- But that was to Danskoi, right? To Danskoi, CS3 does not say such a thing to Greenberg. Right. So she doesn't, she's not explicitly on notice in the same way. And so she contrives her conduct, sends him to the bathroom to review it. So when he comes back for his mock interview, he now knows the information in the blog and in the materials. So he's able to answer the questions in such a way where she's not now learning all the specifics about how misleading those materials are and how untruthful they are. She says, go to the bathroom, study up on it, and then come back and we'll talk. And by taking that affirmative act, that's Greenberg not subjecting herself to what she would have learned had he not crammed in the bathroom before his asylum interview. Further, before the immigration court appearance, and this is the last thing I'll say, I see my time is up, Your Honor. She, the, CS1 tells Greenberg, look, am I going to get in trouble for this? You know, I, someone else got in trouble for making up stories. And she says, just sit there, don't say anything, don't be so obvious. So avoiding him being obvious and saying more at that point would reveal more to her about what he did. If there are no further questions, Your Honor, we submit the conviction should be affirmed. Thank you. Mr. Brindley. Yes, Your Honor. Thank you. A couple of responses. First, I think that the question Your Honor asked regarding Yates' applicability, I think that's correct. I think Yates does apply. I think that is a legal sufficiency with respect to 1546A. And how can you stand here and argue Yates having declined, specifically declined more individualized verdicts that would have avoided the problem altogether? Well, I don't think that constitutes a knowing waiver by the defendants. The defendants weren't really on notice probably of what that meant at that time. Or it would say, hey, I don't even know if the defendants were present for the verdict forum discussion. And I think the way. Well, they could waive through their lawyers, right? With respect, a knowing, sometimes and sometimes not, a knowing waiver of a right like that, in this instance a right to claim that evidence was legally insufficient, I don't think they can do that without that being explicitly set forth for them and them saying we waive that. The consequences of the verdict forum, I don't think that was reflected in the record in a way that the defendants would have known what that made or ought to appeal. If it turns out under the law one of the objects was not legally sufficient, that they couldn't raise that. I don't think that was a clear waiver at all for that reason. Going back to ultimately the question of the psychological avoidance and the wolf of blindness, I think the problem here is very much what happened when counsel tried to argue his point. What he really is doing is he's arguing knowledge. That's all. I mean, he's arguing knowledge and arguing knowledge and arguing knowledge. But when it comes time for the jury instruction, they want to hedge it and have their cake and eat it, too, and we're going to get wolf of blindness, too, just in case. The problem is when they get that, and there isn't really any deliberate act of avoidance, everything they're talking about was you should have asked more questions. Failure to ask more questions, particularly in the context, in this specific context of an attorney who's trying to help a client that they're just meeting, these people are meeting in a very limited amount of time before they're interacting with Greenberg. She hasn't met with them much. She's learning this on the fly in these recordings. And when that happens, when it's a lawyer and the question is, well, you should have interrogated more, you should have asked them this question or that question, I don't think that makes any sense at all in this context. If it was knowledge and they believe it was, they could have proved it and then we would know. But by interjecting the wolf of blindness into this, we don't know whether the jury convicted because she knew or because they convicted because they thought she should have done more to find out. And the latter is not the crime. And I do think that this final point on this, I think this is made even more confusing by the ethical instructions that were given that omitted the fact and suggested that, first of all, it suggested that Ms. Greenberg had a duty to disclose things that were told to her. When, in fact, the ethical rules in the state of New York have a carve-out that says she does not have to do that. Even if she knows it's false, she doesn't have a duty to disclose. And that was left out. And so I think when you combine the fact that the jury got the wolf of blindness and this idea that the lawyer has to disclose what the client is saying, you put those two together and you have a likelihood that she's convicted not because they thought that she knew, but because they thought that she should have interrogated more and should have disclosed her suspicions. Because jurors don't know what our obligations are as lawyers, and the instructions on ethical obligations of lawyers were all focused on disclosure. Well, no, no, that's not right. I mean, there was a sentence about it. It was a little bit about disclosure to a tribunal, but they also talked about lawyers required to avoid assisting the client, for example, by drafting or delivering documents that the lawyer knows are fraudulent or by suggesting how the wrongdoing might be concealed. If the client fails to take necessary corrective action and the lawyer's continued representation would assist the client, conduct that is illegal to lawyers required to withdraw, none of that instruction, I mean, any of the facts that the jury could have found tied into the failure to disclose also would have been triggered by that unobjectionable part of the same instruction. Well, that was talking about withdrawing. It's not really talking about disclosing. There's another portion of the instructions where they indicate that some disclosure may need to be made. And it was inaccurate. The lawyer can't disclose. So we have an inaccurate instruction on the ethics, and then you combine that with the idea that if you don't interrogate enough, maybe you're guilty of willful blindness. And so we put all of that together. I don't think that the confidence in this verdict can be maintained. I think the willful blindness instruction was wrong, and the case should be reversed. Thank you. Thank you all. Appreciate your arguments. We'll take it under advisement.